A01A0660. MANNING v. THE STATE.
(550 SE2d 762)

BLACKBURN, Chief Judge.

Following a jury trial, Marlando S. Manning appeals his convictions on a multiple of criminal charges, including two counts of rape, aggravated sodomy, kidnapping with bodily injury, false imprisonment, armed robbery, burglary, and using a false name. Manning was charged with raping two women in the same apartment complex

---

where he lived with his grandparents in separate incidents occurring about five weeks apart. We affirm.

Investigators linked Manning to the crimes through a pawnshop receipt for a camera stolen during the second sexual assault. A bank surveillance tape captured Manning using one victim's automated teller machine card about an hour after the rape. Both victims identified Manning as their assailant from a photographic array.

After his motion for new trial was denied, Manning sought to discharge his appointed appellate counsel. Following a hearing, the trial court refused to dismiss appellate counsel, finding that Manning did not present sufficient reasons for doing so. In this pro se appeal, Manning contends that the trial court erred by allowing the in-court identification of him by the two victims; by admitting into evidence certain documents seized from his residence; and by allowing trial counsel to make a statement in place instead of removing herself. Manning also claims that his trial counsel rendered ineffective assistance and that the evidence was insufficient to support the convictions because the evidence presented did not connect him to the charged conduct.

On appeal, the evidence must be viewed in a light most favorable to the verdict. *Pollard v. State.*[1] So construed, the evidence shows that early one morning, D. M. was stepping out of the shower when she saw a man rushing toward her with a knife. She screamed in fear. Thinking more clearly, D. M. then repeatedly reassured her assailant that she had not seen his face even though she had. After placing a pillowcase over her head, binding her hands and feet, and yanking an electrical cord tight around her neck, the perpetrator raped D. M. at knifepoint. When he demanded the pin number for her ATM card, she provided an incorrect number. Later, in response to police questioning, D. M. initially told investigators that she did not get a good look at the rapist because she feared he would return and kill her if she identified him, as he had threatened to do. D. M. was able to recall details of her attacker's appearance including his race, height, slender build, high cheekbones, discolored lips, and "real slim face." D. M. expressed certainty when selecting Manning from an array of photographs. At trial, she testified that she had no doubt that Manning was her attacker, "because I will never forget his eyes. I will never forget his lips. I will never forget his face."

The second assault occurred in the early morning as well. As C. M. was locking her door to leave home, a black male wearing gloves suddenly appeared and shoved her back inside her apartment. Placing a knife against her neck, her assailant warned her to "stop

---

[1] *Pollard v. State*, 230 Ga. App. 159 (495 SE2d 629) (1998).

screaming or I'll kill you." Covering C. M.'s head with two shirts, he severed a telephone cord and used it to tie her hands. After rummaging through her purse, he demanded her pin number and threatened to kill her if she lied about her number. Holding a knife to her throat, he raped her twice. After sodomizing her, he dragged her to a bathtub and forced her into it. When C. M. wriggled loose and thought he had left, she saw him standing in the doorway of the bathroom. While retying her, he reiterated his threats to kill her. He then left.

About five weeks after the rape, C. M. viewed the same photographic lineup as D. M. After an investigator provided preliminary instructions, C. M. tentatively identified Manning as her attacker. She testified that she initially saw the rapist for only a second or two because her eyes were covered for most of the incident. She described his clothing, slim build, and facial features, noting a "very definite bone structure around his eyes." At trial, she felt Manning looked "extremely similar" to her attacker.

An ATM card belonging to C. M. was used at four different teller machines on the morning of the attack. C. M. thought the man in the photographs taken by ATM surveillance cameras looked like the same man who raped her. The serial number on the pawnshop receipt for a Minolta camera matched the number recorded by C. M. for such camera on an insurance policy.

1. Manning contends that the trial court erred by allowing in-court identifications of him by both victims because such identifications were tainted by their earlier identifications of him in an unduly suggestive photographic lineup.

A conviction based on eyewitness identification at trial following a questionable pretrial identification will be set aside only if the identification procedure was impermissibly suggestive and, under the totality of the circumstances, the suggestiveness gave rise to a substantial likelihood of misidentification. *Miller v. State.*[2] When reviewing a ruling on a motion to suppress, this Court must construe the evidence most favorably toward upholding the trial court's findings and judgment, unless they are clearly erroneous. *Karim v. State.*[3]

Here, the trial court conducted a pretrial hearing on Manning's motion to suppress the victims' identifications of him. During the hearing, Detective Leonard Dreyer explained that before showing the photographic array to D. M., he read a comprehensive list of admonitions to her. Dreyer advised her that the lineup might not contain her assailant's photo and that the guilty person might not have been

---

[2] *Miller v. State*, 270 Ga. 741, 743 (2) (512 SE2d 272) (1999).
[3] *Karim v. State*, 244 Ga. App. 282, 284 (2) (535 SE2d 296) (2000).

caught. He instructed her that she did not have to select anyone and reminded her that hairstyles and facial hair could change. He also told her that the photographs might not depict the true complexion of a person. After carefully studying the pictures for three to five minutes, D. M. positively identified Manning as her assailant. Another investigator, Detective Michael Bailey, testified that he used the same array with the other victim. Before showing the photographs to C. M., Bailey likewise provided precautionary instructions. Then, after studying the pictures carefully, the victim eliminated everyone else and tentatively selected Manning's photograph.

After examining the array and noting the similarities and differences among the six men depicted, the trial court found the array to be a "fairly balanced photographic lineup." Although Manning claims that the heights of the men in the photographs varied, if this is so, it is not apparent from the photographs, which do not contain height bars and show the men only from the chest upward. The persons appearing in the photographs look similar, and no one person stands out. Even assuming arguendo that there are imperfections in the composition of this photographic lineup, they do not create the kind of suggestiveness that would inexorably lead the viewer toward the conclusion that Manning was the perpetrator. See *Karim,* supra at 286. Since the lineup was not impermissibly suggestive and was unlikely to have resulted in irreparable misidentification, its admission over objection was not improper. *Anderson v. State.*[4]

2. Manning asserts that the trial court erred by admitting into evidence a notice from his bank sent to him at his grandparents' address because the court already had allowed the admission of another bank statement of his, seized from his grandparents' apartment. Manning claims that this evidence was irrelevant and duplicative. We disagree.

A trial judge may exercise discretion to exclude relevant evidence when its probative value is substantially outweighed by the risk that its admission will create substantial danger of undue prejudice. *Webster v. Boyett.*[5] But here, the evidence was used to establish that Manning lived with his grandparents in the same apartment complex where the attacks took place. The evidence was relevant, and the fact that it pointed toward Manning's guilt did not preclude its introduction. See *Hudson v. State.*[6]

3. Manning contends that the trial court abused its discretion in permitting his counsel to present a stipulated statement to the jury instead of removing herself from his case. Defense counsel's state-

---

[4] *Anderson v. State*, 238 Ga. App. 866, 874 (5) (519 SE2d 463) (1999).
[5] *Webster v. Boyett*, 269 Ga. 191, 195 (1) (496 SE2d 459) (1998).
[6] *Hudson v. State*, 234 Ga. App. 895, 901 (3) (b) (508 SE2d 682) (1998).

ment arose in the following context. Aida Benitez, Manning's girlfriend, testified that on July 23, the same day as the attack on C. M., Manning had some cameras and other items that were not his. After she accompanied Manning to her brother's home, Ramon Benitez helped Manning pawn the cameras by allowing his name and identification to be used at a pawnshop. The pawned cameras were later identified by C. M. as having been stolen from her during the attack. When Ramon Benitez heard that police wanted to question him about the pawned cameras, he asked Manning, "what's going on?" Benitez testified that Manning would not tell him anything, and "panicked," leaving that same day on a bus for New York. After being arrested for theft by receiving, Ramon Benitez implicated Manning and told police where Manning lived. Investigators obtained a search warrant for Manning's apartment and, in his bedroom, discovered two bank statements and a library card using that address.

On cross-examination, when Aida Benitez was asked whether she had lied to protect her brother in her statement made to police, she denied having done so. Prior to the close of evidence, Manning's counsel announced that a stipulation had been reached with the State to allow the attorney to state that Aida Benitez had telephoned her and had admitted lying in a statement to police in order to protect her brother. Manning now argues that because his trial counsel announced the stipulation, rather than removing herself from the case and testifying, his counsel was not subject to cross-examination and he was, therefore, prejudiced.

At the motion for new trial hearing, defense counsel explained that she had chosen to make the stipulation rather than to testify because she had expended considerable time and effort in preparing for trial. According to counsel, Manning was "very active" in the preparation of his case and fully agreed with that decision. We fail to see, and Manning does not explain, how he was prejudiced by the decision of his counsel to remain on the case and make the stipulation, rather than to withdraw and testify. Harm and error must both be shown to authorize reversal. *Honeycutt v. State.*[7] Neither has been shown here.

4. Manning contends that his trial counsel rendered ineffective assistance. To establish ineffective assistance of counsel within the meaning of *Strickland v. Washington*,[8] an appellant must show not only that his counsel's performance was deficient but also that the deficient performance prejudiced his defense. *Rucker v. State.*[9] Failure to satisfy either prong of the *Strickland* standard is fatal to an

---

[7] *Honeycutt v. State*, 245 Ga. App. 819, 821 (3) (538 SE2d 870) (2000).

[8] *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[9] *Rucker v. State*, 268 Ga. 406, 407 (2) (489 SE2d 844) (1997).

ineffectiveness claim. *Brewer v. State*.[10] Prejudice exists where
" 'there is a reasonable probability the jury would have reached a dif-
ferent verdict, absent the error of counsel.' " *Watson v. State*.[11] The
trial court's finding that the defendant was afforded effective assis-
tance of counsel must be upheld unless it is clearly erroneous. *Slade
v. State*.[12] Although Manning asserts four grounds, we will consider
only those that are not duplicative.

(a) *Counsel's failure to file a speedy trial demand*. Since Manning
did not file a statutory demand for speedy trial under OCGA § 17-7-
170, his claim of a constitutional violation must be analyzed under
the framework set forth in *Barker v. Wingo*.[13] The factors to be con-
sidered, weighed, and balanced are: (1) the length of the delay; (2)
the reason for the delay; (3) the defendant's assertion of the right;
and (4) the prejudice to the defendant. *Jernigan v. State*.[14]

Manning's trial counsel testified that Manning did not indicate
that he wanted to demand a speedy trial until February 1999. Since
the indictment was returned on October 9, 1997, any demand would
have been untimely and would have required the trial court's con-
sent. See OCGA § 17-7-170. By then, the case was already set for
trial in March 1999. In March, however, D. M. was injured in a car
accident in another state and could not travel. The trial began in July
1999 when the victim was able to return to Georgia.

Counsel explained that part of the delay was attributable to
awaiting results of DNA testing, that Manning said would exonerate
him. When the case was continued in March 1999, counsel noted in
her file that "Mr. Manning indicated to me that that was fine because
that will give us more time to try to investigate and try to find some
more evidence in this case." Manning provided her with information
about a second pawnshop receipt that she thought might link Ramon
Benitez to the crimes. In these circumstances, we find no abuse of
discretion in the trial court's determination that Manning's Sixth
Amendment right to a speedy trial was not violated. *Judge v. State*.[15]

(b) *Counsel's failure to attack the arrest warrant and search war-
rant*. "Whether to file pretrial motions and how to argue them are
strategic decisions, and when reasonable in the context of the case,
do not constitute error." *Stroud v. State*.[16] Manning's trial counsel tes-
tified that probable cause was "established within the body of the
search warrant." She explained that she could find no reasonable

---

[10] *Brewer v. State*, 224 Ga. App. 656, 657-658 (2) (481 SE2d 608) (1997).
[11] *Watson v. State*, 243 Ga. App. 636, 637 (534 SE2d 93) (2000).
[12] *Slade v. State*, 270 Ga. 305, 308 (2) (509 SE2d 618) (1998).
[13] *Barker v. Wingo*, 407 U. S. 514 (92 SC 2182, 33 LE2d 101) (1972).
[14] *Jernigan v. State*, 239 Ga. App. 65 (517 SE2d 370) (1999).
[15] *Judge v. State*, 240 Ga. App. 541, 543 (1) (524 SE2d 4) (1999).
[16] *Stroud v. State*, 272 Ga. 76, 78 (4) (526 SE2d 344) (2000).

legal basis for filing a motion to suppress the items found during the search of Manning's apartment. She also noted that no inculpatory evidence was discovered during that search. Consequently, Manning's claim that his trial counsel failed to contest the admission of two items found during the lawful search is devoid of merit. Trial counsel also testified that she could discern no legal basis for attacking the arrest warrant. Because trial counsel's strategic decisions appear reasonable, the trial court's finding that Manning was afforded effective assistance of counsel is not clearly erroneous. *Slade*, supra.

5. Manning contends that the evidence was not sufficient to sustain his convictions. We disagree. The evidence established that at the time of the crimes, Manning was living in the same apartment complex as his victims. Both women identified Manning as their attacker, and both testified he threatened to kill them and brandished a knife. Camera equipment stolen during the second rape was pawned within hours by Manning and his friend, Ramon Benitez, who implicated Manning as the source of the stolen property. Manning's flight to another state, the ATM videotape and photographs created from the video, as well as the testimony of Aida Benitez and Ramon Benitez, all pointed toward Manning's guilt. Thus, the evidence supports the convictions. See *Gadson v. State*.[17]

*Judgment affirmed. Pope, P. J., and Mikell, J., concur.*

DECIDED JUNE 25, 2001.

Marlando Manning, *pro se*.

J. Tom Morgan, *District Attorney*, Barbara B. Conroy, John H. Petrey, *Assistant District Attorneys*, for appellee.

---

[17] *Gadson v. State*, 223 Ga. App. 342, 343 (1) (477 SE2d 598) (1996).