A11A0088. WRIGHT v. THE STATE.
(712 SE2d 105)

MIKELL, Judge.

In 1994 a Fulton County grand jury indicted Tyrone Terrell Chambers and George Bernard Wright for committing twelve offenses against four women: rape, aggravated sodomy, kidnapping, and armed robbery of K. M. (Counts 1 through 4); rape, armed robbery, and kidnapping of B. J. C. (Counts 5 through 7); armed robbery of A. C. (Count 8); and rape, aggravated sodomy, kidnapping,

and aggravated assault of K. W. (Counts 9 through 12). Chambers entered a guilty plea and testified against Wright at trial. Evidence collected from B. J. C. and K. W. after the rapes matched Chambers's DNA. Although no DNA evidence linked Wright to the rape of B. J. C., the state's DNA expert testified that Wright could not be eliminated as the source of the semen found in the sample received from K. W. because two of the five "markers" exhibited a matching pattern, and the frequency of that pattern in the African-American population was approximately one in sixty thousand. On April 12, 1995, Wright was convicted on all counts and was given three life sentences, to run concurrently, plus four 20-year terms.

In 2006, Wright filed a motion pursuant to OCGA § 5-5-41 (c) for post-conviction DNA testing of the sample obtained from K. W. in light of new technology developed since the time of trial. The trial court granted the motion, and testing performed by the Georgia Bureau of Investigation (GBI) revealed that Wright could not have been the donor of the semen sample recovered from K. W. and admitted in evidence at trial. On July 23, 2009, Wright, proceeding pro se,[1] filed an extraordinary motion for new trial on the basis of newly discovered evidence. Following a hearing at which Wright represented himself, the trial court granted the motion as to Counts 9 through 12 of the indictment, relating to K. W., but denied the motion as to the remaining counts. We granted Wright's application for discretionary appeal to consider his argument that the trial court erred in denying his request for a new trial as to Counts 1 through 8 of the indictment. Because the new evidence is not so material that it would probably produce a different verdict on those counts, we affirm.

## I. The Legal Standards

[To prevail on] an extraordinary motion for new trial, the movant must satisfy the trial court (1) that the evidence came to his knowledge after the trial; (2) that the delay in acquiring the evidence was not the result of lack of due diligence; (3) that the evidence is so material that it would probably produce a different verdict; (4) that the evidence is not merely cumulative; (5) that the witness's affidavit is provided or its absence explained; and (6) that the evidence does not operate solely to impeach the credibility of a witness.[2]

---

[1] On June 29, 2009, the trial court entered an order pursuant to *Faretta v. California*, 422 U. S. 806, 835 (95 SC 2525, 45 LE2d 562) (1975), finding that Wright made a knowing and intelligent waiver of his right to counsel.

[2] (Citations omitted.) *Crowe v. State*, 265 Ga. 582, 591 (15) (458 SE2d 799) (1995). See

Moreover, "[s]uch motions are not favored, and a stricter rule is applied for an extraordinary motion for a new trial based on the ground of newly available evidence than to an ordinary motion on that ground."[3] A trial court's ruling on such a motion "will not be reversed unless it affirmatively appears that the court abused its discretion."[4]

In the case at bar, the only issue is the third factor. The trial court ruled that the DNA evidence was not so material that it would probably produce a different verdict on Counts 1 through 8 of the indictment. Wright argues that the evidence at trial demonstrated that the same two perpetrators committed all the offenses by a unique method; therefore, DNA evidence excluding him as K. W.'s rapist necessarily excluded him as the perpetrator of the offenses against the other three victims. The state counters that there is compelling evidence of Wright's guilt of the remaining crimes, particularly evidence that Wright's fingerprints matched latent impressions lifted from K. M.'s car. Consideration of this argument necessitates careful examination of the evidence adduced at trial, viewed in the light most favorable to the verdict.[5]

## II. The State's Evidence

### A. The Victims' Testimony

(i) K. M. On February 28, 1992, K. M. testified that she was walking from her office at Campus Crusade for Christ to her car at 4:00 a.m., when Chambers, wearing a skull cap, and the other assailant, wearing a ski mask, forced her to get into her car. The taller assailant kept a gun pointed at K. M. and threatened to kill her unless she cooperated.

After driving around for about ten minutes, the assailants stopped the car on Interstate 85 South and ordered her out of the back seat and into the driver's seat. The taller assailant said that he had been in jail before, was not going back, and was just a victim of society. K. M. testified that he kept saying, "I'm not going to fucking jail and no fucking cop is ever going to make me go back. . . . You're not my mama, you're not my sister, you're not my aunt[i]e, I don't love you and I can fucking kill you so you better cooperate." As instructed, K. M. drove to her bank in Union City and withdrew money from the ATM. Afterward, the assailants made her lie down in

---

*Timberlake v. State*, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980) (applying same standards to motion for a new trial based on newly discovered evidence).

[3] (Citation and punctuation omitted.) *Crowe*, supra at 590-591 (15).

[4] (Citation omitted.) *Young v. State*, 269 Ga. 490, 491-492 (2) (500 SE2d 583) (1998); *Drake v. State*, 248 Ga. 891, 894-895 (1) (287 SE2d 180) (1982).

[5] See *Manning v. State*, 250 Ga. App. 187, 188 (550 SE2d 762) (2001).

the back seat of the car, facing the seat, and put a ski mask over her head. They stopped at an apartment complex, and the taller man instructed K. M. to act as if she were his girlfriend and put her arm around him. She took off her mask so she could see. The men walked her to a grassy area at the back of the complex. The taller man unzipped his pants, pushed her head down, and forced her to "suck his penis." K. M. kept gagging, however, and this assailant swore at her, said it "was too fucking cold outside," and both men took her back to the car. The taller assailant got in the back seat with K. M. and told her to take off her clothes. She took off her sweater and bra, and he tried to kiss her and fondled her breasts. Then the assailants moved the car to a darker area of the parking lot and made K. M. take off her pants. The taller assailant tried to rape her, but she fought him; he called her a "bitch" and said she "better spread them apart" or they would kill her. The assailant's penis would not penetrate K. M.'s vagina because she was wearing a tampon; he made her pull it out and throw it on the ground. Still, he could not penetrate K. M.; while calling her "bitch," he spit on her vagina and forced his fingers inside her, whereupon he finally was able to rape her.

Chambers, who held the gun, kept telling this assailant, "hurry up, I want some pussy, too." Chambers then forced her to "suck his penis" and raped her. The other assailant yelled at Chambers because he ejaculated. The men put K. M. in her car and drove to a parking lot. The taller assailant used a crowbar to tear out her car stereo and instructed Chambers to wipe off the car's interior to get rid of fingerprints. The assailants stole other items from the car as well. They told K. M. to stay in the car for five minutes after they left, and they threatened to kill her if she told anyone about the attack.

K. M. testified on cross-examination that the ordeal lasted two or three hours and that she observed both men during that time. She was unable to identify Wright's picture in photographic lineups. However, K. M. identified Chambers and Wright as her assailants at the preliminary hearing held on January 19, 1994. K. M. also identified Wright in court as the taller man who raped her.

*(ii) B. J. C.* On March 4, 1992, B. J. C., who worked at Morehouse College, testified that when she returned home from a basketball game shortly after midnight, she was accosted by two African-American males wearing ski masks[6] as soon as she stepped out of her rental car. The men shoved B. J. C. into the back seat of her car; the taller assailant kept calling her "bitch," yelling other obscenities at her, and threatening to kill her. The taller man got in the back seat,

---

[6] B. J. C. also called these masks "toboggans."

while Chambers drove. The men demanded $500 but B. J. C. only had $45. They stopped the car, shoved her in the front seat, put a ski mask over her head, and told her to put her head between her legs. As they were driving around, B. J. C. asked where they were going. Chambers told her to "shut up or he would shoot my mother fucking head off." She kept quiet. Meanwhile, the taller assailant had gotten out of the car, and it seemed to B. J. C. that Chambers was driving her around an apartment complex, because they kept going over speed breakers. After about 30 minutes, Chambers stopped the car on a grassy area. The taller assailant was waiting. B. J. C.'s face was completely covered, and the assailant put his hands around her waist and walked her over to a brick patio. She saw the patio, as well as sliding glass doors, when she took off her clothes and faced the wall, as instructed by the taller assailant. B. J. C. asked whether he planned to sodomize her, and he replied, "No. . . . I just fuck." B. J. C. pleaded with the taller assailant not to rape her and offered him her diamond rings. He took her jewelry and then ordered her to get on her knees and "suck his dick." When she refused, the assailant raped her. During the assault, he asked her to uncover her breasts, kiss him, and "give him tongue." She refused and started screaming. After the taller assailant was done, Chambers raped B. J. C.

The assailants drove B. J. C. to ATMs at two different banks, but her bank card would not work at either one. At some point, the taller assailant told her that he had been to jail and was a victim of society, and that they were not rapists; they were robbers. Finally, the assailants left. B. J. C. never looked at her attackers during the ordeal and was unable to describe them to the police, except in general height and weight.

*(iii) A. C.* On March 9, 1992, A. C., a postal worker, arrived at home sometime after leaving her job at 12:30 a.m. and was accosted by two men wearing ski masks as she got out of her car. One of the men brandished a silver gun with a pearl handle. A. C. screamed, fell, and dropped her purse; the men said, "bitch, shut up," and told her to get in her car. A. C. struggled with the men as they tried to push her into her car, and the ski mask of the man whom she described as darker complected came off during the struggle. She testified: "I looked him dead in the eyes, he looked me in the eyes. He said, 'man, she saw me.'" The assailant put a ski mask over her head and shoved her into the back seat. The men drove around the corner, where the darker-complected man got into another car. One of the assailants cocked the gun at her head and said, "Bitch, I don't give a fuck about you. You're not my mother. You're not my sister. I ought to put you in the river." The darker-complected man came out, fired the gun, and said, "Do what we say or you will die."

The assailants drove around and eventually stopped on Old

National Highway. They took A. C. to an ATM, where she made three withdrawals totaling $500. A. C. dropped the first two receipts on the ground but gave the men all of the money as well as the receipt for the final $100 withdrawal. The darker-complected man began conversing with A. C., asking what church she attended and commenting on the Mahalia Jackson tape she had in the car. He took her gospel tapes, $130 from her purse, and a diamond ring she was wearing. The assailants began arguing about whether to rape her, and the darker-complected man convinced Chambers to let her go. He told A. C., "My friend loves to fuck but . . . considering God is with you tonight, we're going to let you go." A. C. described the darker-complected assailant as slimmer and taller than the other assailant, with blackheads on his forehead.

*(iv) K. W.* On March 20, 1992, the final victim, K. W., a pediatric nurse practitioner, was abducted from outside her home in Sandy Springs shortly after 1:00 a.m. K. W. had driven her car into the garage and was getting something out of the back seat when Chambers, who was wearing a ski mask and holding a silver gun, told her to get back in the car. She struggled with him, but he subdued her and forced her into the car. Chambers made K. W. put a ski mask over her head, kept telling her to keep her "fucking head down," and repeatedly hit her in the head with his gun. After several minutes, Chambers stopped the car, and a second man wearing a ski mask approached the car. K. W. described the second assailant as taller, thinner, and darker skinned than the man who abducted her.

Eventually, the darker-skinned assailant drove K. W.'s car, and Chambers drove the other vehicle. The darker-skinned assailant drove K. W. to an ATM, but she did not have her ATM card and could not make a withdrawal. The assailant put her back in the car, put a ski mask over her head, and told her that they were going to his house. Once inside, K. W. retrieved a personal identification number from a statement in her briefcase in an effort to access her bank account, but the number did not work at any of the banks where the assailants drove her. After failing to obtain money, the men drove K. W. back to the same house. She described it as mustard yellow, two-story, with a deck and glass sliding doors. The darker-skinned man had K. W. put her arm around him when they walked into the house. Inside, K. W. saw a linoleum floor, and she was taken upstairs into a bedroom. Chambers told her to take off all her clothes except her bra and to spread her legs. Then he raped her. The other assailant entered the room and forced K. W. to perform fellatio on him. Afterward, he raped her, instructing her to say and do certain things such as tell him that he had a large penis. Chambers then forced K. W. to perform fellatio on him. Both men sexually assaulted her repeatedly. The second assailant teased Chambers about the size of his penis, calling him "peewee."

Finally, the assailants put K. W. in her car, and she recalled seeing signs to the airport. The darker-skinned assailant, who was driving, asked about the Christian cassette tapes in the car. He asked how she felt about being raped by two black men and whether she was prejudiced. He asked where she went to church, and K. W. asked him whether he had a Bible. He said he did, but felt horrible about reading it because doing so made him feel guilty. The assailant asked K. W. to forgive him and to pray for him. He also told her that he had been in jail before and could not find a job; that they were not rapists, they were robbers, and this just happened. Finally, he told her to count to 50, and he left.

K. W. was able to identify the house where she was taken. She was never able to identify her attackers.

### B. The Investigation

Lieutenant Wendell Davis Phifer of the Fulton County Police Department, who was the lead investigator when the crimes were first committed, testified that all four victims came in and assisted with developing composite sketches of Chambers and the other assailant. Photographic lineups that included Wright's picture were shown to all the victims, but none of them were able to identify Wright. There was no physical evidence leading to Wright, and the case was placed on inactive status until December 22, 1993. On that date, Suzanne Miller, who took over as the lead detective when Phifer was promoted, was notified that Chambers's fingerprints matched those on file in the GBI's Automated Fingerprint Identification System (AFIS). Chambers was arrested and gave a statement implicating Wright.

Detective Robert D. Pearson, a criminal investigator for the Union City Police Department, testified that he lifted latent fingerprint impressions from K. M.'s car on February 29, 1992, and turned them over to Detective Mike Isom, who was in charge of the Union City investigation. Marion N. McDonald, Jr., manager of the records and identification section of the Fulton County Police Department, testified that he did not receive the impressions until January 19, 1994, the date of the preliminary hearing. Two days later, McDonald obtained ink fingerprint and palm print impressions from Wright, and those impressions matched latent prints lifted from the ashtray and door frame of K. M.'s car. Chambers's prints matched latent fingerprints lifted from the door of B. J. C.'s car, and his prints were on an ATM receipt as well.

The investigation revealed that K. M. was raped at Hidden Woods Apartments, 3110 Godby Road, in Union City, and that Wright resided at the complex. B. J. C. also was raped at an apartment complex on Godby Road. Both A. C. and K. W. were taken to ATMs on Old National Highway. K. W. was raped at a residence

located at 6160 Connell Road, which was Chambers's home.

*C. Chambers's Testimony*

Chambers testified that he entered a guilty plea and received three life sentences plus twenty years. He gave a lengthy statement to the police, which corroborated many of the details to which the victims testified. Significantly, Chambers testified that Wright carried a chrome .380 pistol during each incident and that he and Wright committed all of the offenses.

## III. The Defense

No witnesses testified for the defense except Wright, who denied committing any of the offenses. Wright also testified that he had been fingerprinted in 1991 when he was arrested for armed robbery and kidnapping, although the charges were dismissed. However, Wright admitted that he resided at 3110 Godby Road when the rapes were committed and that he could not remember where he was or what he was doing at those times. He also admitted that he had been convicted of public indecency in 1989, and that one of the conditions of his probation was to "undergo sex counseling." Wright also was convicted of "carrying a pistol without a license" in 1992.

## IV. Discussion

In light of the strength of the evidence that Wright committed the charged offenses,[7] we cannot conclude that the new DNA evidence excluding him as the donor of the semen sample recovered from the fourth victim is so material that it warrants a new trial on the offenses committed against the first three victims.[8] The evidence that Wright's fingerprints were found in K. M.'s vehicle is strong circumstantial evidence of his guilt.[9] Wright offered no explanation for the presence of his fingerprints at that crime scene, and "[w]here there is no evidence explaining how a defendant's fingerprints came to be at a crime scene, the jury may conclude that the only reasonable explanation for their existence is that they were impressed there during the commission of the crime."[10]

---

[7] The jury deliberated for only 39 minutes before finding Wright guilty on all counts.

[8] See *Crowe*, supra; *Chapel v. State*, 270 Ga. 151, 153 (2) (510 SE2d 802) (1998) (noting "high materiality" requirement to warrant a new trial on the basis of newly discovered evidence).

[9] See *Leonard v. State*, 269 Ga. 867, 868-869 (1) (506 SE2d 853) (1998) ("The evidence suggests no occasion for [Wright] to have left his fingerprints there except during the crime, and the evidence authorized the jury to conclude that every reasonable hypothesis was excluded except [his] guilt.") (citations omitted).

[10] (Citations omitted.) *Rivers v. State*, 271 Ga. 115, 117 (1) (516 SE2d 525) (1999).

Wright argues that there are "glaring irregularities" in the fingerprint evidence which would have caused the jury to discount that evidence if the new DNA results had been introduced. Wright cites the absence of an immediate AFIS hit on the prints collected from K. M.'s car as suggesting that the prints were not his prints. In this regard, the Union City investigator, Pearson, testified that after he lifted the prints from K. M.'s car, he turned them over to Detective Mike Isom, who took them to the state crime lab. Pearson testified that the lab report would have been sent to Isom, who did not testify. It was not until the preliminary hearing that Miller, from the Fulton County Police Department, discovered the fingerprint match. Wright argues that this evidence provides ample reason to question the integrity of documentation and chain of custody with regard to the latent fingerprints. But it is unnecessary to show the chain of custody of fingerprint cards.[11] And a bare speculation of tampering does not affect the admissibility of fingerprint evidence.[12] Although Wright questions the weight and not the admissibility of the fingerprint evidence, he has never made a factual showing to rebut that evidence.[13] Wright has thus not demonstrated how the new DNA evidence affecting K. W. would persuade a jury that his prints were not present in a different victim's vehicle.[14]

The fingerprint evidence is not the only compelling evidence linking Wright to the crimes against the other victims. The evidence showed that K. M. was raped at the apartment complex where Wright resided and that B. J. C. was raped at a complex on the same street. Wright had pleaded guilty to carrying a concealed weapon, a pistol, around the time the rapes were committed, and Chambers testified that Wright used a pistol against all of the victims in this case. Wright also had pleaded guilty to public indecency in 1989 and had been ordered to undergo sex counseling. K. M. positively identified Wright as her attacker, both at the preliminary hearing and at trial. Wright argues that K. M.'s identification of him at the preliminary hearing is suspect because he was wearing prison garb at the time. Wright argues that, in general, the identification evidence was weak because none of the other victims were able to

---

[11] See *Hill v. State*, 254 Ga. 213, 214-215 (3) (326 SE2d 757) (1985) ("A fingerprint is far from fungible. The value of a fingerprint lies in its unique pattern. A fingerprint card, thus, may be admitted into evidence without the showing of a chain of custody since it can be readily identified by reference to the subject's fingerprints.") (citation omitted).

[12] *Meadows v. State*, 135 Ga. App. 758, 760 (219 SE2d 174) (1975).

[13] See generally *Brown v. State*, 268 Ga. App. 24, 26-27 (1) (601 SE2d 405) (2004).

[14] Cf. *Bell v. State*, 227 Ga. 800, 805, 807-808 (183 SE2d 357) (1971) (Confession and conviction of another person for the same crime for which defendant was convicted warranted a new trial on the basis of newly discovered evidence although sufficient evidence, including defendant's fingerprints at scene, authorized his conviction.).

identify him. But K. M.'s testimony was neither weak nor contradictory.[15] She testified that, although she could not identify Wright from a photographic array, she was certain it was him when she saw him in person.[16]

Wright's primary contention is that the four criminal episodes bear such strong similarities that they must have been committed by the same two perpetrators, and since the new DNA evidence exonerates him of the rape of K. W., that evidence necessarily excludes him as the perpetrator of any of the other offenses. To be sure, there are many similarities among the crimes. They were committed during a three-week period, between February 28 and March 20, 1992. All four victims were abducted at gunpoint near their vehicles and were robbed, and all, except A. C., were sexually assaulted. All victims, except A. C., testified that the perpetrators said they were robbers, not rapists. Chambers's co-defendant told A. C. and K. M. that he did not care about them because they were not his family, and he told all the victims that he had been to jail and was a victim of society. He called them all "bitch," and he mentioned Christianity to all the victims.

But we reject Wright's basic premise that the new DNA evidence exonerates him of all crimes against K. W. The trial court did not make that ruling. The court held that the new evidence is so material that its introduction would probably produce a different result on the counts pertaining to K. W. The new evidence shows only that Wright was not a donor of the semen found in the swabbings obtained from K. W. Ejaculation, of course, is not an essential element of rape. "A person commits the offense of rape when he has carnal knowledge of . . . [a] female forcibly and against her will. . . . Carnal knowledge in rape occurs when there is any penetration of the female sex organ by the male sex organ."[17] Thus, penetration is necessary, but ejaculation is not, and "sometimes perpetrators do not ejaculate."[18] In this case, the first victim, K. M., testified that Wright saw Chambers wiping himself off after raping her and yelled, "I told you not to come inside of her." This evidence permits a strong inference that Wright was careful not to ejaculate when he raped the

---

[15] Cf. *Bell*, supra at 809 ("In numerous other cases an important element in the decision to allow a new trial has been the fact that the evidence sustaining the verdict was weak or unsatisfactory.") (citations omitted).

[16] See generally *Green v. State*, 242 Ga. App. 868, 870 (1) (532 SE2d 111) (2000) (new evidence did not warrant new trial because it did not show "falseness, impossibility, or even improbability of the victim's direct testimony at trial") (footnote omitted); accord *Turner v. State*, 270 Ga. App. 245, 246-247 (3) (606 SE2d 296) (2004).

[17] OCGA § 16-6-1 (a) (1).

[18] *Page v. State*, 271 Ga. App. 541, 542 (610 SE2d 171) (2005). See *Wightman v. State*, 289 Ga. App. 225, 227 (1) (656 SE2d 563) (2008).

victims. Accordingly, the new DNA evidence may warrant a new trial as to K. W., but it does not compel the conclusion that a different verdict on the counts pertaining to the other victims would probably have resulted had it been introduced. Therefore, the trial court did not manifestly abuse its discretion in denying Wright's extraordinary motion for new trial on Counts 1 through 8 of the indictment.[19]

*Judgment affirmed. Smith, P. J., and Dillard, J., concur.*

DECIDED JUNE 16, 2011.

*Peter K. Odom*, for appellant.
*Paul L. Howard, Jr., District Attorney, Peggy R. Katz, Assistant District Attorney*, for appellee.