**July 12, 2013**

# In the Court of Appeals of Georgia

A13A0444. WALKER v. THE STATE.                                    JE-019C

ELLINGTON, Presiding Judge.

A Houston County jury found Ernest Walker guilty beyond a reasonable doubt of possession of cocaine with intent to distribute, OCGA § 16-13-30 (b); and obstruction of a law enforcement officer, OCGA § 16-10-24 (a). Walker appeals, challenging the trial court's denial of his motion to suppress and its grant of the State's motion to quash subpoenas. For the following reasons, we reverse.

1. Walker contends that he was subjected to an investigatory detention when an officer stopped him as he stepped off the premises of an elementary school and instructed him to remove his hands from his pockets. Walker contends that the officer lacked a particularized and objective basis for suspecting that he was involved in criminal activity, as required for such a stop, and that, in the absence of any

reasonable, articulable suspicion of criminal activity, he was entitled to refuse to comply with the officer's demands and to end the encounter by running away from the officer. Because the officer lacked a reasonable, articulable suspicion of criminal activity, Walker contends, the detention violated his Fourth Amendment right to be free from unlawful searches and seizures, and the trial court erred in denying his motion to suppress a quantity of cocaine and other drug-related items that were obtained as a result of the illegal detention.

> When reviewing a trial court's decision on a motion to suppress,
>
> this [C]ourt's responsibility is to ensure that there was a substantial basis for the decision. The evidence is construed most favorably to uphold the findings and judgment, and the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous. Further, since the trial court sits as the trier of fact, its findings are analogous to a jury verdict and will not be disturbed if there is any evidence to support them.

(Citation and punctuation omitted.) *Brown v. State*, 301 Ga. App. 82, 82-83 (686 SE2d 793) (2009). "[W]here the evidence is uncontroverted and no question regarding the credibility of witnesses is presented, [however,] the trial court's application of the law to undisputed facts is subject to de novo appellate review."

2

(Punctuation and footnote omitted.) *Burgess v. State*, 290 Ga. App. 24 (658 SE2d 809) (2008).

(a) We first consider whether the officer detained Walker in violation of the Fourth Amendment. Our Fourth Amendment jurisprudence recognizes three tiers of police-citizen encounters:

> (1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause. In the first tier, police officers may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave. The second tier occurs when the officer actually conducts a brief investigative . . . stop of the citizen [under *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LE2d 889) (1968)]. In this level, a police officer, even in the absence of probable cause, may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity. . . . To make a second-tier stop, . . . a police officer must possess more than a subjective, unparticularized suspicion or hunch. The officer's action must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant intrusion. Further, the court must be able to determine that the detention was

3

neither arbitrary nor harassing. . . . Moreover, in determining whether the stop was justified by reasonable suspicion, the totality of the circumstances – the whole picture – must be taken into account.

(Citations, punctuation, and footnote omitted.) *Brown v. State*, 301 Ga. App. at 84-85.

The exclusionary rule, which has been codified in Georgia,[1]

prohibits introduction into evidence of tangible material seized during an unlawful search [or seizure], testimony concerning knowledge acquired during an unlawful search [or seizure], and both tangible and testimonial derivative evidence that is the product of the primary evidence or that is otherwise acquired as an indirect result of the unlawful search [or seizure], up to the point where the taint is dissipated by its attenuated connection with the unlawful search [or seizure]. The core rationale for extending the exclusionary rule to "fruit of the poisonous tree" is that the admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

(Citations and punctuation omitted.) *Teal v. State*, 282 Ga. 319, 323 (2) (647 SE2d 15) (2007). See also *United States v. Maryland*, 479 F2d 566, 568 (5th Cir., 1973)

---

[1] OCGA § 17-5-30 (a) (1) ("A defendant aggrieved by an unlawful search and seizure may move the court[, inter alia,] . . . to suppress as evidence anything so obtained on the grounds that . . . [t]he search and seizure without a warrant was illegal[.]").

4

("If there is a nexus between lawless police conduct and the discovery of the challenged evidence which has not become so attenuated as to dissipate the taint, then the evidence should be suppressed.") (citation and punctuation omitted).[2]

At the hearing on Walker's motion to suppress, the arresting officer testified that, just after midnight on February 23, 2011, he was searching the area around Pearl Stephens Elementary School in Houston County, looking for an unidentified man who had been seen trying to steal a motorcycle nearby. The suspect in the attempted theft was described as an African American male in dark clothing. The officer saw

---

[2] See also Anne E. Melley, 11 Ga. Proc. § 26:47 (December 2012 update) (the origin of the exclusionary rule); Wayne R. LaFave, 1 Search and Seizure, A Treatise on the Fourth Amendment, § 1.1 (f), pp. 23-29 (5th ed.) (purposes of the exclusionary rule); Wayne R. LaFave, 5 Search and Seizure, A Treatise on the Fourth Amendment, § 11.4 (a), pp. 328-329 (5th ed.) ("The question of [an] attenuated connection [between a constitutional violation and evidence derived therefrom] is largely a matter of degree, and thus application of the test is dependent upon the particular facts of each case." Relevant factors focus on the deterrence function of the exclusionary rule and include: (1) where the chain between the challenged evidence and the primary illegality is long or the linkage can be shown only by sophisticated argument, and, thus, it is highly unlikely that obtaining the challenged evidence motivated the police officers to commit the illegality, exclusion would seem inappropriate; (2) where the evidence is used for some relatively insignificant or highly unusual purpose, it is similarly unlikely that obtaining the challenged evidence motivated the police officers to commit the illegality, and exclusion would, therefore, effect no deterrence; and (3) where the undesirable police conduct is particularly offensive, the deterrence ought to be greater and, therefore, the scope of the exclusion broader.) (punctuation and footnotes omitted).

5

Walker, who was wearing a blue sweatshirt and very light colored pants, walking off the school property. The officer approached Walker, who put his hands into his sweatshirt pockets. The officer commanded Walker to take his hands out of his pockets.

Walker did not remove his hands from his pockets as instructed but yelled at the officer that he was just trying to get home. Walker then ran away from the officer, who gave chase. As they ran, the officer saw Walker throw a pill bottle and a paper towel to the ground. Eventually, the officer caught up with Walker in a backyard and again instructed Walker to remove his hands from his pockets. When Walker failed to comply, the officer tasered and subdued him. Other officers responded to assist, and they placed Walker in custody. Officers found a pocket knife on the ground near Walker. Along the route of the chase, the arresting officer collected a pill bottle with Walker's name and address on it that contained five pieces of what was later determined to be solid cocaine and a "crack" pipe and clothespin that were wrapped in a paper towel.

When asked at what point during his encounter he decided to arrest Walker, the officer responded, "when he takes off running from me after I attempt to stop him, because what is he doing at Pearl Stephens Elementary School at twelve minutes after

6

midnight?" The officer testified that, once he commanded Walker to remove his hands from his pockets, Walker was not free to leave. Further, the officer testified that he did not stop Walker based on any observation that Walker's race or clothing matched those in the report describing the theft suspect, nor did he identify any other factual basis for stopping Walker, other than his presence at that time and place.

Based on the officer's testimony, the trial court concluded that, "the officer initially made contact with [Walker] and instructed him to take his hands out of his pockets. . . . This [was] a brief investigatory stop." Further, the trial court concluded that, even though Walker's clothing did not match the suspect the officer was looking for, the investigatory stop was supported by a reasonable, articulable suspicion, based on the fact that Walker was walking on the grounds of an elementary school after midnight.

Under *Terry v. Ohio* and its progeny, the officer was entitled to approach Walker and to attempt to question him, and Walker was free to walk – or run – away and avoid such a first-tier encounter. *Brown v. State*, 301 Ga. App. at 84.[3] What the

_____

[3] See also *Thomas v. State*, 301 Ga. App. 198, 200-201 (1) (687 SE2d 203) (2009) (An encounter is deemed first tier if a reasonable person in the citizen's position would feel "free to decline the officer's request to speak with [him or her] or otherwise terminate the encounter. Indeed, a citizen's ability to walk away from or otherwise avoid a police officer is the touchstone of a first-tier encounter, and even

officer may have intended as a first-tier encounter, however, almost immediately escalated into a second-tier stop when the officer commanded Walker to remove his hands from his pockets; as such, the detention had to be supported by articulable suspicion. Id.

In this case, implicit in the officer's stated basis for detaining Walker is an assumption that Walker was trespassing on school property.[4] The officer, however, simply lacked enough information to elevate such an assumption to a reasonable

running from police during a first-tier encounter is wholly permissible.") (citations and punctuation omitted).

[4] We note that the trial court did not find, and the record does not support a finding, that Walker voluntarily stopped to speak with the officer. Further, the dissent posits that, when the officer first approached Walker and Walker first put his hands into his pockets, "the officer immediately and reasonably interpreted [Walker's conduct] as indicating a possible threat to his safety." The officer did not so testify, however, and, in fact made no comment about any feelings about his personal safety that he had *before* he escalated the encounter to a second-tier Terry stop. Cf. *Santos v. State*, 306 Ga. App. 772, 775-776 (1) (703 SE2d 140) (2010) (Where a person approached by an officer chose to stop and talk to the officer, rather than to end the encounter, and nervously fidgeted with his hands, put his hands in his pockets, removed his jacket and threw it on the patrol car, and continued to put his hands in his pockets after the officer told him to keep his hands where the officer could see them, and where the officer testified that he became concerned for his personal safety, such menacing conduct during the initial first-tier encounter gave rise to a reasonable suspicion that the person posed a threat to the officer's safety and justified an escalation to an investigative detention.). Any feelings about his personal safety that the officer had *after* he impermissibly escalated the encounter cannot factor into our Fourth Amendment analysis.

8

suspicion. Specifically, there is no evidence that the officer had any information that Walker was present on school property without the consent of the school, for an unlawful purpose, after receiving notice from the school that his presence was forbidden, after receiving notice from the school to depart, or without a legitimate cause or need to be there.[5] That is, the officer had no information that Walker's

[5] A person commits the offense of criminal trespass when he or she intentionally damages any property of another without consent of that other person and the damage thereto is $ 500.00 or less or knowingly and maliciously interferes with the possession or use of the property of another person without consent of that person [or when] . . . he or she knowingly and without authority . . . [e]nters upon the land or premises of another person . . . for an unlawful purpose; . . . [e]nters upon the land or premises of another person . . . after receiving, prior to such entry, notice from the owner, rightful occupant, or, upon proper identification, an authorized representative of the owner or rightful occupant that such entry is forbidden; or . . . [r]emains upon the land or premises of another person . . . after receiving notice from the owner, rightful occupant, or, upon proper identification, an authorized representative of the owner or rightful occupant to depart.

OCGA § 16-7-21 (a), (b).

It shall be unlawful for any person to remain upon the premises or within the school safety zone as defined [by statute] of any public or private school in this state or to remain upon such premises or within such school safety zone when that person does not have a legitimate cause or need to be present thereon. . . . Any person who . . . [i]s present upon the premises or within the school safety zone of any public or private school in this state and willfully fails to remove himself or

9

presence was connected with a criminal, rather than with an innocent, purpose, such as maintenance work that needed to be completed when the school was not open. Further,

> [i]t is well established that mere presence in an area of suspected crime is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Moreover, an officer's feeling that a person is acting in a suspicious way does not amount to a particularized and objective basis for suspecting him of criminal activity.

(Punctuation and footnotes omitted.) *Ewumi v. State*, 315 Ga. App. 656, 661 (1) (727 SE2d 257) (2012). In this case, even considering the totality of the circumstances, we conclude that the officer's observation of an unidentified person exiting school property shortly after midnight did not "amount to an objective, articulable suspicion of criminal activity. At best, they represent an officer's well-honed intuition, or hunch." (Citation and punctuation omitted.) *Brown v. State*, 301 Ga. App. at 86. See *Ewumi v. State*, 315 Ga. App. 656, 659-663 (1) (Where the defendant was present in a high-crime area, wore a hooded sweatshirt in early March, walked in a slumped

---

herself from such premises after the principal or designee of such school requests him or her to do so . . . shall be guilty of a misdemeanor of a high and aggravated nature.
OCGA § 20-2-1180 (a), (b).

10

position away from an officer's attempted first-tier questioning, and ignored the officer and refused to identify himself to the officer, such conduct did not justify an investigatory detention.); *Brown v. State*, 301 Ga. App. at 83-85 (The arresting officer's past experience with the defendant, the defendant's presence in an apartment complex where he was not a resident, the fact that the area was known for its drug and criminal activity, the fact that the defendant was wearing both a hooded sweatshirt and a jacket, and the defendant's actions in quickly walking in a direction that was away from his residence, taken together with their rational inferences, did not amount to articulable suspicion of criminal activity because there was no objective manifestation that the defendant was either committing, or was about to commit, a crime.); *State v. Harris*, 261 Ga. App. 119, 120-122 (581 SE2d 736) (2003) (When a police officer approached the defendant after seeing him go into a hotel room and then walk back into the breezeway, the officer lacked the reasonable suspicion required to escalate the initial first-tier encounter, during which the defendant was nervous, stuttering, and unable to give coherent answers to the officer's questions, to an investigatory detention.).[6]

---

[6] Cf. *Burgess v. State*, 290 Ga. App. 24, 26-27 (658 SE2d 809) (2008) (Where a property owner told narcotics investigators that unknown persons were growing marijuana on her property and gave her permission for entry onto her property to

Further, we note that, to the extent that flight from an officer might contribute to a suspicion of criminal activity where such behavior is not provoked by illegal police conduct,[7] Walker's flight happened *after* and as a result of the officer's violation of Walker's constitutional rights in initiating a second-tier investigatory detention without any reasonable suspicion of criminal activity. Walker's exercise of his right to avoid a first-tier encounter, "even if accomplished by running, cannot constitute obstruction.[8] That is to say, even though the officer was lawfully

investigate whether trespassers were so engaged, and where the property owner's son-in-law reported that a black pickup truck with two occupants had recently entered the property, the investigators gained reasonable and articulable suspicion that two men were involved in criminal trespass or other criminal activity, and therefore had the authority to detain them in a brief investigatory stop, when they went to the property within about 30 minutes of the report of the presence on the property of two unauthorized persons in a black pickup truck, noted "No Trespassers" signs on the property, found an unoccupied black pickup truck on the property, with tools in its bed useful for harvesting marijuana and with four-wheeler tracks leading away from it, and then spotted the two men riding a four-wheeler toward the black truck.).

[7] See *Illinois v. Wardlow*, 528 U. S. 119, 124 (120 SCt 673, 145 LE2d 570) (2000) (Nervous, evasive behavior, including "headlong flight" upon seeing a police officer, where such behavior is not provoked by illegal police conduct, is a pertinent factor in determining reasonable suspicion.); *Arnold v. State*, 304 Ga. App. 90, 91-92 (1) (695 SE2d 402) (2010); *Crowley v. State*, 267 Ga. App. 718, 719-720 (601 SE2d 154) (2004).

[8] "[A] person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor." OCGA § 16-10-24 (a).

12

discharging his duties at the time [Walker] fled, those official duties during the first-tier encounter did not include detaining [Walker] or preventing him from leaving." (Punctuation and footnote omitted.) *Ewumi v. State*, 315 Ga. App. at 663 (1) (a). See also *State v. Jones*, 303 Ga. App. 337, 340 (693 SE2d 583) (2010) (A suspect's decision to exercise his or her right to avoid an officer in a first-tier encounter "can hardly give rise to a reasonable suspicion of criminal activity; otherwise, a citizen could *never* exercise his right to avoid an officer without that officer then claiming that the exercise of that right gave the officer a reasonable suspicion of criminal activity. Such logic would automatically escalate every first-tier encounter (where a citizen exercised his right to walk away or to ignore the officer) to a second-tier encounter.") (citation omitted); *State v. Dukes*, 279 Ga. App. 247, 251 (630 SE2d 847) (2006) (At the time the defendant fled from police officers, the officers were engaged in a proper first-tier encounter with him, and thus they were lawfully discharging their official duties. Nevertheless, the defendant's flight from that encounter did not obstruct or hinder the officers' discharge of their official duties, because the officers' duties during such a first-tier encounter did not include

13

detaining the defendant or creating the impression that he was not free to leave.).[9] Because Walker's flight at that juncture did not constitute the additional offense of obstruction, his flight was not relevant to the determination of whether the officer had reasonable suspicion of criminal activity when the officer escalated the encounter. *Ewumi v. State*, 315 Ga. App. at 663 (1) (a); *State v. Dukes*, 279 Ga. App. at 251. Thus, the second-tier encounter between Walker and the officer was unlawful for lack of articulable suspicion, and the seizure of the challenged evidence was directly and immediately related to the illegal detention. *Ewumi v. State*, 315 Ga. App. at 660-661 (1); *Brown v. State*, 301 Ga. App. at 85; *State v. Harris*, 261 Ga. App. at 122.

(b) In its order denying Walker's motion to suppress the contraband, the trial court found that, as argued by the State, by pulling the contraband from his pocket

---

[9] Cf. *Barber v. State*, 317 Ga. App. 600, 602 (1) (b) (732 SE2d 125) (Where an officer observed the defendant violating OCGA § 40-6-96 by walking down the center of the roadway, the officer had a reasonable suspicion sufficient to justify a brief investigatory detention, and no constitutional violation occurred before the defendant fled from the officer and discarded contraband along the way.); *Reynolds v. State*, 280 Ga. App. 712, 714-716 (1) (634 SE2d 842) (2006) (Although a traffic stop was illegal, attempting to flee from such stop is a separate crime altogether under Georgia law, that is, fleeing or attempting to elude under OCGA § 40-6-395 (a), regardless whether the investigative stop was proper. Consequently, the defendant's flight from the traffic stop provided an independent basis for his arrest, and contraband that he discarded as he fled from officers was admissible.).

14

and discarding it as he ran away from the officer, Walker "lost any [F]ourth [A]mendment protection, as [the contraband was] not recovered pursuant to a search but [was] picked up off the ground."

"While it is true that a criminal defendant's voluntary abandonment of evidence can remove the taint of an illegal stop or arrest, it is equally true that for this to occur the abandonment must be truly voluntary and not merely the product of police misconduct." (Citations and punctuation omitted.) *United States v. Beck*, 602 F2d 726, 729-730 (II) (5th Cir., 1979). Where a person, who has been unlawfully detained, is motivated by the expectation of an impending arrest to throw away contraband, which agents of the State later collect, there is no *voluntary* abandonment of the contraband sufficient to dissipate the taint of the illegal detention. Id. at 730 (II) (Where police officers stopped an automobile without a reasonable suspicion of criminal activity, after which the occupants of the car threw a marijuana cigarette and a small plastic bag which contained more drugs and a syringe, the contraband was tainted by the illegal stop. The car's occupants' "acts of abandonment [did] not reflect the mere coincidental decision of [them] to discard their narcotics; it would be sheer fiction to presume they were caused by anything other than the illegal stop."); *Lawrence v. Henderson*, 478 F2d 705, 708 (5th Cir. 1973) (Where police officers

15

arrested the defendant without probable cause, and then found drug paraphernalia in the back of the patrol car used to transport the defendant to jail, the habeas court correctly determined that the illegal arrest prompted the defendant to conceal the contraband in the police vehicle and, therefore, that the defendant did not voluntarily abandon the drug paraphernalia, which should have been excluded from evidence at the defendant's trial as the fruit of the unlawful arrest.).[10] Again, there was no attenuation of the taint because the seizure of the challenged evidence was directly and immediately related to the illegal detention.

---

[10] See John Wesley Hall, Jr., 1-13 Search and Seizure (4th ed.) §§ 13.2 ("[A]bandonment is not presumed or inferred from the defendant's actions or inactions. There must be a clear manifestation that the accused is relinquishing his right to privacy.") (footnote omitted); 13.8 ("As a general rule, an act of apparent abandonment which was caused by illegal police conduct is legally ineffective as fruit of the poisonous tree. Thus, no abandonment has been found where the accused dropped an object, for example: as an officer reached for a gun during an unlawful detention, the officers were unlawfully in hot pursuit, or the officer made an invalid stop or arrest or search.") (footnotes omitted); Wayne R. LaFave, 1 Search and Seizure, A Treatise on the Fourth Amendment, § 2.6 (b), pp. 887-889 (5th ed.) ("[A]lthough abandoned property may normally be obtained and used for evidentiary purposes by the police, this is not so if the abandonment was coerced by or otherwise the fruit of unlawful police action. Property is not considered abandoned when a person throws away incriminating articles due to the unlawful activities of police officers. Thus, where a person has disposed of property in response to an illegal seizure or search by the police, courts have not hesitated to hold that property inadmissible.") (punctuation and footnotes omitted).

Based on the foregoing, we conclude that the trial court erred in denying Walker's motion to suppress the evidence derived from the illegal second-tier detention. *Ewumi v. State*, 315 Ga. App. at 660-661 (1); *Brown v. State*, 301 Ga. App. at 85-86; *State v. Harris*, 261 Ga. App. at 122.

2. Walker contends that the trial court erred in granting the State's motion to quash his subpoenas for the production of the tangible evidence that was collected and seized after his arrest on February 23, 2011. Because this alleged error may recur in the event of a retrial, we will address it on the merits, under the abuse of discretion standard of review. See *Bazemore v. State*, 244 Ga. App. 460, 463-464 (2) (535 SE2d 830) (2000).

The record shows that the subpoenas in question were served on three employees of the Warner Robins Police Department and directed them to produce the items of tangible evidence at 9:00 a.m. on May 4, 2012 (when motions in multiple cases were scheduled to be heard), at the Superior Court of Houston County. See OCGA § 24-13-23 (a) (former OCGA § 24-10-22 (a)) ("A subpoena may . . . command the person to whom it is directed to produce the evidence designated therein."). In moving to quash the subpoenas, the State argued that the subpoenas were unreasonable and oppressive. See OCGA § 24-13-23 (b) (1) (former OCGA §

17

24-10-22 (b)) ("The court, upon written motion made promptly and in any event at or before the time specified in [a] subpoena for compliance therewith, may . . . [q]uash or modify the subpoena if it is unreasonable and oppressive[.]"). Specifically, the State argued, given that Walker had opted into reciprocal discovery under Georgia's Criminal Procedure Discovery Act, OCGA § 17-16-1 et seq., it had complied with the statutory requirements for reciprocal discovery by making the evidence available for his inspection at another time and place.[11] Further, the State argued that transferring many items of evidence that were involved in multiple cases from the custodial agency to the courthouse on a busy motions calendar day provided the subpoenaing party little time to inspect and photograph the evidence, required the involvement of many government employees, and created a risk of loss or corruption of the evidence.

---

[11] The record shows that issuing subpoenas for the production of evidence at the courthouse, rather than scheduling a time to inspect, copy, and photograph evidence at the custodial agency, was the routine practice of the public defender's office. The court noted that Walker did not claim that his counsel and the prosecuting attorney had been unable to agree to a time for the inspection of the tangible evidence, nor had his counsel sought the court's intervention regarding the scheduling of a time for inspection. Rather, Walker "freely concede[d] that [his counsel] made no effort" to inspect the evidence as provided under OCGA § 17-16-4 (a) (3), despite having received a list (via the police report) of the specific items of tangible evidence and notice that the evidence was available for inspection at the police department.

18

In quashing the subpoenas, the trial court held that "[t]he issue of whether a subpoena is unreasonable or oppressive [under Georgia law] presupposes that use of a subpoena is otherwise appropriate. In this case it is not." Rather, the court ruled, because Walker had opted into reciprocal discovery pursuant to the Act, his counsel was required to contact the appropriate agency and schedule an appointment at their mutual convenience to inspect and photograph the tangible objects. See OCGA § 17-16-4 (a) (3) (A) (Except as otherwise provided, "the prosecuting attorney shall, no later than ten days prior to trial, or as otherwise ordered by the court, permit the defendant at a time agreed to by the parties or ordered by the court to inspect and . . . photograph . . . tangible objects . . . which are within the possession, custody, or control of the state or prosecution and are intended for use by the prosecuting attorney as evidence in the prosecution's case-in-chief or rebuttal at the trial or were obtained from or belong to the defendant.").

It is clear that the Act regulates discovery in felony criminal cases when the defendant opts into reciprocal discovery and imposes upon both the prosecution and the defense a duty to disclose evidence beyond that which the parties would, apart from the Act, otherwise have a means to compel. *State v. Lucious*, 271 Ga. 361, 361-362 (1) (518 SE2d 677) (1999). It does not follow, however, that a defendant

19

who elects to have the Act apply thereby waives the right to use means of discovery that are otherwise available to any party, such as the subpoena power. The State may then respond or may move to quash the subpoena, as it did in this case. "When a motion to quash is filed, the party serving the subpoena has the initial burden of showing the [items of evidence] sought are relevant." (Citation and punctuation omitted.) *Bazemore v. State*, 244 Ga. App. at 460 (1). If the party serving the subpoena makes the requisite showing of relevancy, the party moving to quash then has the burden of showing that the subpoena is unreasonable and oppressive under OCGA § 24-13-23 (b) (1). *Bazemore v. State*, 244 Ga. App. at 464 (2). "Whether the trial court should quash a subpoena depends on the nature and scope of the discovery request." (Citation and punctuation omitted.) Id.

In this case, the record shows that defense counsel had little, if any, reason to insist that the tangible evidence be produced at the courthouse in conjunction with the motions calendar, other than to challenge the district attorney's authority to implement policies and procedures for making such evidence available for inspection at the agency having custody of the evidence. Still, Walker's point is well taken that, by ruling that defense counsel's use of subpoenas was not "appropriate," simply because Walker had elected to proceed under the Act, the trial court failed to resolve

20

the State's motion to quash Walker's subpoenas under the applicable standard. Any future motions to quash will be subject to the proponent's burden of showing relevancy and, if that burden is met, the opponent's burden of showing that the subpoena is unreasonable and oppressive.

*Judgment reversed. Phipps, C. J., Barnes, P. J., and Miller, J., concur. Andrews, P. J., Ray and Branch, JJ., dissent.*

A13A0444. WALKER v. THE STATE.

BRANCH, Judge, dissenting.

The trial court properly denied Walker's motion to suppress evidence discarded in his flight from an officer investigating why he was on the property of an elementary school after midnight, and it did not abuse its discretion when it granted the State's motion to quash Walker's subpoenas concerning evidence already made available to him. I therefore dissent to both divisions of the majority opinion.

1. The arresting officer first testified that he saw Walker "walking off" the property of an elementary school shortly after midnight. Although this testimony alone would have supported a reasonable inference that the officer saw Walker trespassing, the officer later testified under cross-examination that he had seen Walker on school property. Obviously, then, the trial court had evidence to support its explicit factual conclusion that Walker "was walking on the grounds of an elementary school after midnight."

The majority cites no authority, and we have found none, for the proposition that a member of the public not employed by or attending a school is authorized to be on school property in the middle of the night. On the contrary, Walker's presence

2

on school property at that time gave this officer the authority to make a brief investigatory stop in order to determine whether Walker was violating OCGA § 16-7-1 (b), which outlaws the "knowing" entry onto property for an unlawful purpose or after notice that such entry is forbidden, or OCGA § 20-2-1180 (a), which outlaws "any person" from "remaining" on school property "when that person does not have a legitimate cause or need to be present thereon." See, e.g., *In the Interest of R. C.*, 289 Ga. App. 293, 295 (2) (c) (656 SE2d 914) (2008) (evidence that juvenile remained on school property after having been advised against doing so was sufficient to sustain an adjudication of delinquency by reason of criminal trespass).

Here, the officer testified that Walker was not free to leave "until [the officer] figured out what [Walker] was doing" on the property of the elementary school, and the trial court explicitly held that Walker's act of walking on school property after midnight warranted "a brief investigative detention." This conclusion is entirely consistent with this Court's holdings that a police officer gains the authority to make a second-tier investigatory stop when he obtains a reasonable and articulable suspicion that a defendant's presence on a property "may have been unauthorized" and that the defendant "may have been engaging in some criminal activity," including "criminal trespass," on that property. *Oglesby v. State*, 311 Ga. App. 615, 619 (716

3

SE2d 742) (2011); see also *Bishop v. State*, 299 Ga. App. 241, 242-243 (682 SE2d 201) (2009) (officer had reasonable and articulable suspicion justifying a stop when the officer observed the defendant leaving the driveway of a vacant lot where there had been prior incidents of illegal dumping, abandoned vehicles, and thefts).

The majority relies on *Brown v. State*, 310 Ga. App. 82 (686 SE2d 793) (2009), for much of its analysis, including the conclusion that this encounter escalated into an impermissible second-tier detention when the officer commanded Walker to remove his hands from his pockets (maj. op. at 8-11). This reliance is not well-founded. In that case, defendant Brown was walking through the parking lot of an apartment complex at around 9 p.m. when he was seen and then stopped by a police officer who knew that he was not a resident there. Id. at 83. When the officer ordered Brown to take his hands out of his pockets, Brown did not comply until the officer drew a weapon on him, at which Brown discarded a crack pipe on the ground and walked to the officer's patrol car, where he was arrested. Id. This Court held that when the officer told Brown to remove his hands from his pockets, the officer impermissibly initiated a second-tier encounter without any articulable suspicion that Brown had commmitted a crime. Id. at 85-86.

4

The distinction between *Brown* and other cases cited by the majority and the case before us is that the arresting officer in *Brown* should have known that even a non-resident of an apartment complex could be on the property in the evening with the permission of a resident such that walking through its parking lot would not amount to a crime, see *Brown*, supra at 86, whereas the officer who saw Walker on school property after midnight could reasonably assume, pending the outcome of a brief investigatory stop, that Walker was not on the property for any authorized purpose. See *Oglesby*, supra at 619 (officer drew a reasonable conclusion, based on his experience and the totality of the circumstances, that defendant may have been engaged in criminal behavior sufficient to justify a brief investigative detention); *Burgess v. State*, 290 Ga. App. 24, 26-27 (658 SE2d 809) (2008) (investigators responding to report of unauthorized persons on property in black pickup truck gained authority to detain two persons seen driving toward such a truck on the same property for purposes of a brief investigation). Compare *Ewumi v. State*, 315 Ga. App. 656, 659-663 (1) (727 SE2d 257) (2012) (defendant in hooded sweatshirt who walked away from officer's attempted first-tier questioning was not subject to an investigatory detention); *State v. Harris*, 261 Ga. App. 119, 120-122 (581 SE2d 736)

5

(2003) (officer who saw defendant walk into hotel room and then back out into breezeway lacked reasonable suspicion required for investigatory detention).

The record also shows that when the officer approached Walker with authority to detain him briefly for purposes of investigating whether a criminal trespass had occurred, Walker put his hands in his sweatshirt pockets, which the officer immediately and reasonably interpreted as indicating a possible threat to his safety. At this point, the officer "was authorized to continue the detention and to perform [a] pat-down search for his safety." *Oglesby*, supra at 619; see also *Lewis v. State*, 307 Ga. App. 593, 595 (705 SE2d 693) (2011) (defendant's detention and pat-down search was authorized when, while present in a high crime area near a closed convenience store at night, he appeared extremely nervous, grabbed his pants pocket, and provided an implausible explanation for his presence on a property).

Here, Walker not only disobeyed the officer's repeated commands to take his hands out of his pockets, but yelled at the officer and fled the scene, discarding a pill bottle with crack cocaine in it as well as a crack pipe. A pocket knife was also found on the ground next to Walker after he was apprehended, which the officer interpreted as the object Walker had been "digging for" in his pockets. Finally, then, and as the trial court also held, Walker's flight from a legal investigative detention, along with

6

the contraband he discarded during that flight, provided sufficient justification for his arrest. See *Arnold v. State*, 304 Ga. App. 90, 92 (1) (695 SE2d 402) (2010) (officers were authorized to arrest a defendant who ran from approaching officers and threw away a pill bottle containing what appeared to be crack cocaine).

For all these reasons, I would affirm the trial court's denial of Walker's motion to suppress.

2. As the majority notes, we review a trial court's ruling on a motion to quash a subpoena only for an abuse of discretion. *Bazemore v. State*, 244 Ga. App. 460, 463 (2) (535 SE2d 830) (2000).

Here, Walker subpoenaed the evidence custodians and arresting officer to bring all seven items of tangible evidence seized in the case. It is undisputed, however, that after Walker opted into reciprocal discovery under OCGA § 17-6-4, he made "no effort" to inspect the same evidence when it was made available to him under the trial court's established policy for reciprocal discovery. See OCGA § 17-6-4 (a) (3) (prosecutor shall permit a defendant "at a time agreed to by the parties or ordered by the court" to inspect tangible objects in the State's custody and intended for use as evidence). It is also undisputed that Walker objects only to the discovery policy itself such that there is "no motion or controversy (but for the discovery policy) before the

[trial court] in which the subpoenaed evidence would be needed by the defendant for consideration[.]"

Under these circumstances, the majority cannot refute the trial court's explicit finding that Walker has not shown why he needed the evidence at issue delivered to the courthouse for inspection or how a quashing of the subpoenas would prejudice his preparation of the case. Thus I cannot agree that the trial court abused its discretion when it concluded that in light of Walker's failure to avail himself of the opportunity for evidence review provided by the State, his use of subpoenas to protest the trial court's reciprocal discovery policy was not "appropriate." See *Townsend v. State*, 236 Ga. App. 530, 533 (3) (511 SE2d 587) (1999) (trial court did not abuse its discretion when it granted State's motion to quash defendant's subpoena for all documents concerning a blood sample when the State gave defendant access to perform his own tests on the sample).

For both of these reasons, I respectfully dissent. I am authorized to state that Andrews, P. J., and Ray, J., join in this dissent.